Lloyd C. POLLARD, Plaintiff,

v.

John W. GARDNER, Secretary of Health, Education and Welfare, Defendant.

Civ. A. No. 15111-3.

United States District Court
W. D. Missouri, W. D.
April 17, 1967.

Edward L. Simmons, Kansas City, Mo., for plaintiff.

F. Russell Millin, U. S. Atty., and John L. Kapnistos, Asst. U. S. Atty., Kansas City, Mo., for defendant.

## MEMORANDUM OPINION, ORDER AND JUDGMENT REVERSING THE DECISION OF THE DEFENDANT

BECKER, Chief Judge.

This is an action under the Social Security Act to review a final decision of the Secretary of Health, Education, and Welfare denying to plaintiff a period of disability under Section 416(i) of Title 42, U.S.C.A., and disability insurance benefits under Section 423 of Title 42, U.S.C.A. Jurisdiction exists under Section 405(g) of Title 42, U.S.C.A. Unless otherwise designated, all statutes cited hereinafter are contained in Title 42, U.S.C.A. Statutory references herein will be to statutes in force at the time plaintiff's application for benefits was filed.

Defendant has filed a motion for summary judgment in which affirmance of defendant's decision is requested. Plaintiff's suggestions in opposition to that motion request that the decision be set aside and that judgment be entered for the plaintiff or, in the alternative, that plaintiff be granted a new hearing by a different hearing examiner.

Counsel for plaintiff has also filed a motion for an order of Court awarding him an attorney's fee of twenty-five per cent of plaintiff's recovery.

### STATUTES INVOLVED

Sections 416(i) (1) and 423(c) (2) both define disability as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."

Sections 416(i) (1) and 423(c) (2) further provide that:

"An individual shall not be considered to be under a disability unless he furnishes such proof of the existence thereof as may be required."

Section 405(g) provides that:

"The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive * * *."

### PRIOR ADMINISTRATIVE PROCEEDINGS

On September 25, 1961, plaintiff, Lloyd C. Pollard, filed an "Application for Period of Disability and/or Disability Insurance Benefits".

On March 5, 1962, plaintiff's wife, Viola B. Pollard, filed an "Application for Substitution of Payee" in which she stated "I am his wife & am able to manage our affairs".

By letter dated July 10, 1962, plaintiff was informed by Lester O. Webber, Chief, Evaluation and Review Branch, Social Security Administration District Office, St. Joseph, Missouri, that the above-described applications had been denied.

On July 16, 1962, plaintiff filed a "Request for Reconsideration". By letter dated September 24, 1962, entitled "Notice of Reconsideration Determination", plaintiff was informed by C. C. Hall, Chief, Reconsideration Branch, that the denial of his application remained unchanged.

On March 12, 1963, plaintiff filed a "Request for Hearing". On May 13, 1963, the hearing was set for May 23, 1963. On May 20, 1963, plaintiff appointed a lawyer, E. L. Simmons, Esquire, his representative. On request of Mr. Simmons the hearing set for May 23, 1963, was continued. The hearing was reset for January 16, 1964, and held on that date.

On February 28, 1964, the hearing examiner rendered his decision denying the application of plaintiff.

On April 9, 1964, plaintiff filed a "Request for Review of Hearing Examiner's Action". On May 20, 1964, the Appeals Council of the Bureau of Hearings and Appeals, Social Security Administration, Department of Health, Education and

Welfare, denied the request for review, thereby making the decision of the hearing examiner the final decision of the defendant.

## HISTORY

The evidence summarized under this subtitle consists of underlying facts disclosed by the record. Where appropriate the evidence will be stated in the form of a summary of an exhibit.

Plaintiff was born on August 29, 1911, at Polo, Missouri. (Tr. 47) He was raised on his father's farm at Elmira, Missouri. (Tr. 48) His father was a farmer who owned two farms, one of 400 acres, the other of 90 acres. (Tr. 49) His father had asthma. The farming operation of plaintiff's father consisted primarily of "speculation" in livestock. (Tr. 49) Plaintiff finished the eighth grade (Tr. 50) and after leaving school worked on his father's farm until he was 18. (Tr. 51) Plaintiff has had asthma since he was 18 years old. (Tr. 54, 57) At age 18, plaintiff married his first wife, Eleen Akers (Ex. 1), and then farmed on shares 200 acres of his father's farm as a dairy farm with 60 acres in corn and oats. (Tr. 51, 52) Plaintiff continued this farming operation for two years until he and his wife separated (Tr. 53) and were divorced (Ex. 1). Plaintiff then returned to his parent's farm home where he was employed by his father for several years. (Tr. 53) In the latter part of 1936 plaintiff bought a pickup truck and thereafter, for about a year, earned his living hauling livestock to Kansas City. (Tr. 54) Plaintiff's hauling business ended when his truck burned, after which he moved back to his parent's home where he farmed until 1939, when he married his present wife. (Tr. 54) On his marriage to his present wife plaintiff resumed farming with his father on shares. (Tr. 55) Plaintiff has had asthma since he was 18 and "year round" since 1940. (Tr. 47, 54) Plaintiff's farming on shares with his father continued until 1946. (Tr. 55) In this farming on shares, plaintiff had one to two hired hands year round. (Tr. 55, 56) Plaintiff did not personally repair farm machinery or keep the farm records during this time. (Tr. 56)

In 1946, Dr. Burer, M.D., now deceased, told plaintiff to quit farming if he wanted to live. (Tr. 57) Thereafter plaintiff "just kind of piddled around till '47" when he bought a two ton dump truck in March 1947. (Tr. 58) Then plaintiff was self-employed hauling rock, dirt and lime for contractors until the end of 1955. (Tr. 58, 59) From approximately 1948 to 1958 plaintiff and his family lived in Elmira, Missouri. (Tr. 40) In the Spring of 1955, plaintiff's wife and two oldest sons again started farming the farm which plaintiff had, in the meantime, inherited from his father. (Tr. 59) At that time the ages of plaintiff's children, a daughter and three sons, were 14 (daughter), 12, 11 and 9. Plaintiff continued in the hauling business until the end of 1955. The dust in which plaintiff sometimes worked in the hauling business bothered him "some", but not "much". (Tr. 81) Plaintiff later gave up the hauling business because the jar of riding in the truck interfered with the function of his kidneys and made his back sore. (Tr. 81, 82) One reason that plaintiff's wife and sons started farming in 1955 was because the wife of plaintiff wanted to get the boys out of town so they could learn how to farm. (Tr. 62) At the time plaintiff's wife and sons started farming in 1955 plaintiff thought he was going to have to give up trucking because the riding was hurting his kidneys. (Tr. 62) Plaintiff helped in the farming operation in 1956 and 1957. (Tr. 60) He had to slow down in the Fall of 1957 because he "got to feeling bad". (Tr. 60) Plaintiff stopped working on the farm in 1958. (Tr. 60) Plaintiff and his family moved from town to the farm in the Fall of 1958. (Tr. 39)

Plaintiff believed that he has been unable to "perform gainful services since September 15, 1958". (Ex. 15) Plaintiff's wife and sons have operated plaintiff's farm since September 15, 1961, without any physical, advisory or

managerial help from plaintiff. (Ex. 16) Following September 15, 1958, plaintiff was "bedfast" as a result of asthma for about 27 days. (Ex. 15) He resumed farm work on a limited basis in the latter part of October 1958 and was able at that time to do some combining and "other farm work" even though he was weak and still suffering from asthma. (Ex. 15) Plaintiff supervised two of his sons in the feeding and care of their swine and cattle during the winter of 1958 and 1959; and in the Spring of 1959, plaintiff, with the help of his wife, "planned the farming arrangement". (Ex. 15) The teenage sons of plaintiff worked on the farm weekends until school was out in 1959 and full time that summer. (Ex. 15) Plaintiff was able to combine his milo crop of 50 acres in the late fall of 1959, but was unable to combine his bean crop because of the dust. (Ex. 15) In the Fall of 1959, the care of the swine conflicted with the children's school bus schedule and all swine were sold. (Ex. 14) Plaintiff's sons cared for the cattle during the Fall and Winter of 1959 and 1960. During 1960 plaintiff's sons performed all the farm work in connection with raising crops because plaintiff's asthma condition rendered him unable to enter the fields. (Ex. 14) Plaintiff was able to advise his sons during 1960. (Ex. 14) During 1961, plaintiff's sons performed all the farm work with some help in management from plaintiff's wife. (Ex. 14) Because of his "illness and hospitalization" (more fully discussed hereinafter), plaintiff was unable to work or to advise during 1961. (Ex. 14)

In Exhibit 13 plaintiff states that he began having pain in his right hip "several years ago". Exhibit 13 is undated but apparently came into the record in conjunction with Exhibit 12 which is dated August 23, 1962. Plaintiff claims that in the Spring of 1961 continuous pain in his left hip developed. (Ex. 13)

The "illness and hospitalization" mentioned above refers to plaintiff's commitment to a mental institution, Missouri State Hospital No. 2, on April 15, 1961. (Ex. 22) The commitment was "on doctors orders". (Tr. 86) After plaintiff was admitted to the hospital, his type of admission was changed to "Probate Court order". (Ex. 22) Before going to the hospital, plaintiff tried to kill himself (Ex. 22, Tr. 92), and threatened to shoot himself. (Tr. 92) Guns had to be taken from him once or twice. (Tr. 92) Plaintiff was released from the State Hospital for six months' convalescence leave on July 26, 1961.

Exhibit 9, dated November 3, 1961, is a Report of Contact submitted by a Field Representative of the defendant. The following is stated therein: plaintiff's complaints were shortness of breath, nervousness, that he tired easily, inability "to concentrate or to work for more than a few hours", that walking, working or other types of exertion causes his breathing to become more difficult and him to become highly nervous; that he is often restless. The Field Representative noted that plaintiff was "extremely nervous" and that at times his speech would become incoherent; that he "would hestitate in the middle of a sentence as if he were trying to find the right word or that he was having difficulty in pronouncing the word"; that he "changed positions constantly and at times would stand up and quickly sit down again"; that he "appeared to be excited and nervous when replying to questions and at times he * * * [would stop] in the middle of a sentence and then [go] on to a different subject". It was further stated by the Field Representative that plaintiff performed "light chores when able or assists his wife in the house work".

Exhibit 12, a Work Activity Report dated August 23, 1962, signed by Roy E. Gillip, a Field Representative of defendant, describes plaintiff's farming operations and states that plaintiff's net income for 1961 was $1,700. It is further stated therein that two of plaintiff's sons worked ten to twelve hours a day, seven days a week, performing "full-scale farming activities" and contribut-

ing to the management of the farm; that those sons did all of the work in 1962; that plaintiff's services in connection with his farming have steadily decreased; that plaintiff performed no "physical or work services" in 1962.

Exhibit 10 is a "Continuing Disability Report" made by Field Representative Mr. Gillip on or before August 31, 1962. It appears from the report that plaintiff stated to Mr. Gillip that he was "bedfast" for a period of two weeks following Labor Day in 1961 because of his asthma; that he had not been bedfast since that time but had been confined to his home on many occasions; that many days he does not leave the house; that he takes adrenalin shots from one to three times daily; and on occasions when the asthma condition is very bad, he takes as many as six such shots daily; that he took nerve pills until July 1962 but had stopped taking them; that he had been advised by his doctors not to exercise too much; that a Dr. Warren had informed him that undue exertion "might cause a very bad effect on his heart and might even be fatal"; that he occasionally lost the feeling in his entire left arm; that his medical care and treatment has been neglected because of a lack of money. With respect to plaintiff's daily activities, the report (Exhibit 10) indicates that plaintiff told Mr. Gillip that he does a limited amount of reading but continuous reading makes him nervous; that he enjoys watching television; that he listens to the radio; that he was able to "perform his own personal needs"; that he washes the dishes and does most of the minor housework; that he walks around the yard for exercise; that while he is able to drive he does so infrequently because it causes him "great fatigue" to drive more than three or four miles; that he does not do any lawn work; that he "attended" a garden plot about 20 feet wide and 30 feet long; that he has no hobbies and takes no part in social, community or church activities; that he enjoyed farming and would like to return to it. In those portions of the report where

Mr. Gillip related his impressions of plaintiff, it is stated that plaintiff had a "very uncertain attitude"; that his movements did not indicate he was suffering from any particular ailment; that he showed the effects of a chronic asthmatic condition; that he "appeared to have a severe cold in his head with drainage and stoppage in his nasal passages"; that he "appeared to talk as though he was talking through his nose at times"; that he occasionally "would gasp for breath as though it was difficult for him to get sufficient air or oxygen".

Plaintiff stated that, during 1962, he performed no farm work but did give some advice in the planting of crops (Ex. 14); that on or before August 1962, he suffered from extreme weakness and this weakness made it difficult for him to walk or rise from a chair (Ex. 13); that at that time, upon awakening he felt "as stiff as a board" (Ex. 13); some days the stiffness gradually disappeared but on other days it did not (Ex. 13); that his "stiffness" was better in hot, dry weather and worse in cool or damp weather (Ex. 13); that he was "unable to perform either management, nor inspection, nor physical work in connection with" his farm. (Ex. 13)

Since 1963, plaintiff's two oldest sons have rented the farm from him. (Tr. 77) The basis of their arrangement is an oral lease under which plaintiff receives one half the crops as rent. (Tr. 79) Under that lease, plaintiff's sons have full responsibility for the farming operation (Tr. 80), and plaintiff provides one half the seed and fertilizer and pays the taxes and maintenance on the farm. (Tr. 83)

## PLAINTIFF'S PRESENT CONDITION

The remainder of the evidence stated herein relates to the time of the hearing unless otherwise noted.

Plaintiff continues to live on his own 400-acre farm which is about 8 miles northeast of Lathrop, Missouri. (Tr. 38, 39) He lives in a three-room house which is not modern and has an outside well. (Tr. 38, 39) Plaintiff lives 16

miles from Cameron, 17 miles from Plattsburg, 22 miles from Excelsior Springs, 50 miles from Kansas City and 50 miles from Independence, all of which are in Missouri. (Tr. 43–47) Cameron has an approximate population of 3,400 and is in a farming community with an ice cream plant and a feed elevator. (Tr. 46, 47) Plattsburg had a population of 1,655 according to the last census. (Tr. 45) It is in a farming community and is a county seat "farm town with normal farm service activities". (Tr. 45, 46) Excelsior Springs has a population over 6,000, a plastic factory and a garment factory, and is a health resort area. (Tr. 44, 45)

Living with plaintiff in the home are his wife and three sons. His sons are D. L., Ronnie and Lynn, whose respective ages are 21, 20 and 18. The plaintiff has a 23 year old married daughter living outside the home. (Tr. 40) All of plaintiff's sons work on the farm; and both D. L. and Ronnie have outside employment with Allis-Chalmers in Independence, Missouri, where combines are built. (Tr. 41, 44) Plaintiff's wife does not work outside the home. (Tr. 42) She did work in a garment factory in Excelsior Springs from July 1960 to October 18, 1963. (Ex. 10, Tr. 42) Plaintiff's wife quit work because plaintiff was unable to do the dishes and things at home; and she couldn't keep up with her work at home and the work at the garment factory. (Tr. 42)

Plaintiff is six feet tall and weighs 235 pounds. (Tr. 47) He normally weighs between 220 and 230 pounds and is trying to lose some weight. (Tr. 47, 48) He can read and write but is a poor speller. (Tr. 50) He has had no vocational or military training. (Tr. 50)

Plaintiff arises between the hours of 4:30 and 8:00 a. m. depending on his family's schedule. (Tr. 66) He retires around 7:00 or 8:00 p. m. (Tr. 66) He generally takes a nap for an hour or two during the day. (Tr. 67) He seldom drives a car, and driving tires him, but when he does drive it is ordinarily a five mile round trip. (Tr. 67) Plaintiff sometimes can and sometimes cannot use public transportation such as a bus. (Tr. 61) He walks about one half a mile per day including his walking in the house. (Tr. 68) Plaintiff has no hobbies, belongs to no clubs or lodges, does not attend church on Sunday, visits in the homes of friends within a four mile radius about once or twice a month, does not go to ball games, and sees about one movie a year. (Tr. 68, 69, 70) When plaintiff goes to the doctor he sometimes drives, other times his wife takes him. (Tr. 69) He does not cook, shop, or help with the laundry. (Tr. 70) He does wash the dishes once in a while, but very seldom. (Tr. 70) Plaintiff does no gardening to "speak of". (Tr. 70) Except on one or two occasions a year when he must have help getting on his trousers, plaintiff is able to take care of his personal needs. (Tr. 70, 71) Plaintiff sleeps "fair" (Tr. 71) or "well" (Tr. 93) and his appetite is "fair" (Tr. 71) or "fairly good". (Tr. 93) Plaintiff reads a little (Tr. 71) and watches television some, but television sometimes "works" on his nerves. (Tr. 72) He listens to the radio quite a bit. (Tr. 73)

Plaintiff chokes up when he lifts anything and sometimes when he walks. (Tr. 62) He has been weak for over two years. (Tr. 62) He tries to get exercise by walking a little ways and then resting. (Tr. 63) Plaintiff's doctors have told him to walk as much as he could. (Tr. 71)

Plaintiff has had constant pain in the area of his lungs for three or four months (Tr. 63, 85) and said pain increases when he gets tired. (Tr. 62)

Plaintiff has had arthritis in both hips for two years or longer and in his right elbow for three or four months. (Tr. 64, 85) The arthritis in his right arm bothers him when he closes or moves his hand. He is right handed. (Tr. 80) For this arthritis plaintiff takes two or three aspirin two or three times a day. (Tr. 65)

Plaintiff also has occasional pain in the general area of his stomach. (Tr. 66)

Asthma and bronchitis cause plaintiff to have constant trouble with his breathing. The trouble with his breathing is sometimes worse than others. (Tr. 84) Plaintiff takes injections of adrenalin for his asthma, the size of which injections varies from one half to one cc and the number of daily injections varies from one to fourteen. (Tr. 65) His wife often gives him the shots. (Tr. 84) His breathing is worse in the morning and she gives him a shot of adrenalin. (Tr. 84) If one shot does not give him relief she gives him another. (Tr. 84)

Plaintiff gulps air through his mouth when he inhales and the air seems to be going into his stomach. (Tr. 74) His breathing is loud and the loud breathing is worse at certain times of the year than at others. (Tr. 74) His breathing difficulty is ordinarily eased for about an hour after a shot of adrenalin (Tr. 74), but two or three times a year he has asthma attacks when he just can't get his breath and must go to the doctor. (Tr. 75) Such an attack is not helped by adrenalin. (Tr. 75) About once a year he has a very severe attack which is called static asthma and "no serum will do you any good". (Tr. 75) Dr. G. Fred Warren, D.O., told plaintiff that when a very severe attack is in progress he is being given a shot five times normal strength of a "different serum" which is "supposed to be the latest". (Tr. 76) Dr. G. E. Johnson, D.O., tried out a new medicine in pill form on him in an attempt to get him off adrenalin because every day he uses adrenalin it cuts his life a little shorter. (Tr. 130)

Plaintiff is nervous, walks the floor a lot (Tr. 84), and can't seem to sit still. (Tr. 92) He takes nerve pills "off and on" whenever they are needed, but at no regular set time. (Tr. 64, 65, 93) Since plaintiff's return from the State Hospital, in 1961, plaintiff seems to worry more about his health and debts. (Tr. 93)

Plaintiff has always had a "hesitation" in his speech, but that it has gotten noticeably worse during the past three or four years. (Tr. 85)

Plaintiff testified that he goes to the doctor once or twice a month, but he prefaced that statement with a statement " * * * finances has kind of run out. I don't go too much". (Tr. 69)

D. L. Pollard, plaintiff's son, testified that it had been a "long time" since plaintiff had been able to come out into the field to help or advise his sons. (Tr. 87)

All medical evidence in the record is in the form of written reports. Each report is an exhibit. The reports will be discussed in chronological order.

In Exhibit 24, a report by Dr. G. Fred Warren, D.O., dated September 25, 1961, there is a brief statement to the effect that he had treated plaintiff the past three weeks for "status asthmaticus".

Exhibit 22 is a form of the defendant entitled "Report from Institution on Individual with Mental Illness or Impairment". It is dated November 10, 1961, and is signed by Dr. Forrest Thomas, M.D., Staff Physician of State (Mental) Hospital No. 2, St. Joseph, Missouri. The following statement appears therein:

"This 49 yrs. old, white, twice married man was admitted to this Hosp. for the 1st time, under Sect. 17, April 15, '61. Type of admission was later changed to Probate Court order. His admission was precipitated by the fact that he made some ineffectual attempts at suicide. Family became scared & brought him here. The patient, during his stay in the hospital showed no evidence of psychosis, however, he is a neurotic individual who has had considerable difficulty in achieving any degree of success during his life, & has not maintained his econimic (sic) status in the community where he lives. He felt guilty concerning this and to propitiate his guilt feeling he has from time to time made immature abortive attempts at suicide only to frighten family & get some much needed attention on a neurotic level."

The following physical impressions were noted by Dr. Thomas: chronic bronchitis; slight hypertension; modern obesity; edema of legs bilateral, etiology unknown; dental caries; glasses. Dr. Thomas' tentative diagnosis was psychoneurosis, anxiety and depressive reaction.

Exhibit 21 is a medical report submitted by Dr. G. E. Johnson, D.O., dated December 20, 1961 on a form provided by defendant. That report reflects that the diagnoses were bronchial asthma, emphysema and sinuitis; that the condition is static; that plaintiff could be classified as a respiratory invalid; that "more tests were not dones because of lack of funds"; that heavy work results in dyspnea.

Exhibit 25 is a report dated January 15, 1962, by G. Fred Warren, D.O., on a form provided by defendant entitled "Physician's Statement (Individual's Capacity to Manage Insurance Benefits)." Therein it is stated that plaintiff's condition was "paranoid schizophrenia"; that the condition had existed ten years; that the prognosis was "no improvement"; that plaintiff "would have a tendency to spend his money on unnecessary medical visits".

Exhibit 26 is a narrative form of medical report submitted by Dr. Emery R. Calovich, M.D. Dr. Calovich is an internist. The report is dated February 1, 1962. In that report Dr. Calovich states in part:

"Clinically I think that we can say that this man has a chronic rhinitis, a mild degree of bronchitis, and also a mild degree of pulmonary emphysema and fibrosis. In addition I think the diagnosis of bronchial asthma should be added. Furthermore I also think that essential hypertension should likewise be included. As far as employment is concerned it would be my impression that all these entities taken either separately or in a group do not make for total disability. As a matter of fact in questioning him very closely concerning his sexual activity I would say that at his age he does better than the average individual and yet he has no complaints of weakness during this period of time. Therefore, I would think that personality-wise that this may offer more of a hint as to disability rather than the organic entities that I have described above and, therefore, would say that this man, on the basis of his organic problems, is not totally disabled from performing gainful activity."

Dr. Calovich conducted pulmonary function studies using a 13.5 Liter Collins Respirometer which apparently measures lung capacity by volume. An exercise tolerance test was performed. The results of the pulmonary function studies are stated with the impression that the effort was fairly good. The exercise tolerance tests are stated but not interpreted. Dr. Calovich notes that plaintiff was sterilized 14 years ago without appreciable "change in his personality or sexual activity whatsoever". (Ex. 26)

Exhibit 28 is a narrative medical report submitted by Dr. Robert S. Terrill, M.D., dated February 12, 1962. Dr. Terrill is a psychiatrist. In his report Dr. Terrill states that the plaintiff is oriented in all spheres; that he is alert and seems to be a reliable informant; that there is no gross evidence of thought disorder, delusions, or hallucinations; the he probably falls in the lower range of average intelligence; that he seems to be obsessed with his neurotic feelings about his health and how he must care for himself; that there is a secondary gain "from the illness inasmuch as he is not or has not been a successful man but now people can excuse him because of ill health"; that he denied any suicidal intentions.

The final substantive paragraph of Dr. Terrill's report is as follows:

Impression: Severe psychoneurotic reaction in a passive-dependent personality. *Although the results of the internist's evaluation are not yet available to me, I would assume that his emotional problem is of greater magnitude than any physical difficulty.* Actually he does not have a great deal of

motivation at this time because so long as his wife is working and the boys are taking over his 'chores' he can maintain his illness and save face with the community. *The patient is unaware of these meanings to his behavior and I am doubtful that he would accept a psychiatric explanation. The neurotic problems are so deeply rooted that his prognosis for recovery is guarded.* At the present time he is quite limited by his illness but I would say that if the physical examination reports indicate the- patient could do some type of non-strenuous work I would say that it would be a helpful thing for him in his recuperative state. An extra hospital adjustment, even under the present circumstances, is desireable (sic) to long-term hospitalization, where actually little is accomplished in such a problem." (Emphasis added.)

Exhibit 31 is a psychological evaluation submitted in narrative form by Miss Betty Rae Eyles, psychologist, The Rehabilitation Institute, Kansas City, Missouri, to which plaintiff was referred in connection with application for disability benefits. The report is dated May 1, 1962. In that report Miss Eyles states the plaintiff has an IQ of 99; that "there is no strong evidence or indication of any actual thought pathology or thinking disorder"; that his academic achievement is generally no higher than about a fifth grade equivalent in basic areas of reading, spelling and arithmetic; that he appears to have a reasonably adequate level of achievement to enable him to get by under ordinary circumstances and to meet the usual demands of every day living; that he has a rather severe lifelong personality disorder on a neurotic level of the passive-aggressive personality type with marked anxiety and dependency features and much somatic preoccupation; that he can maintain his "marginal and not very socially productive or adequate adjustment"; that he is probably not accessible from a treatment standpoint and does not understand the reasons for or sig-

nificance of his disabilities; that he is not apt to become very productive in a job settling, "even one which would be appropriate and feasible in terms both of his basic physical disability and limitations on his somewhat limited level or academic achievement and functioning"; that "it would undoubtedly be beneficial if he could maintain some type of employment, even on a part time basis"; that the examiner agrees with the "conclusions reached from the psychiatric evaluation."

Exhibit 20 is a medical report submitted by Dr. C. E. Johnson, D.O., dated August 24, 1962, on a form provided by defendant. That report reflects that plaintiff has had asthma since age 18 which condition became incapacitating in 1958 (or 1959); that plaintiff also has atelectasis and emphysema; that plaintiff is a "primary respiratory invalid" due to asthma and complications; that "all therapy has failed except daily injections of adrenalin in oil"; that plaintiff's activities are limited by "ability to breathe".

Exhibit 32 is a medical report submitted by Dr. G. Fred Warren, D.O., dated August 24, 1962, on a form provided by defendant. That report reflects the opinion that the plaintiff has chronic bronchial asthma which has responded poorly to therapy; that his condition is static; that there are general restrictions on plaintiff's physical activity; that plaintiff had acute asthmatic attacks in the month of August; that plaintiff has some emphysema; that at times dyspnea results from very slow walking.

Exhibit 19 is a form entitled Transmittal to BOASI-Disability. It is intended for use by state agencies in transmitting material concerning applications to establish disability to the Division of Disability Operations, Bureau of Old-Age and Survivors Insurance. It is from the State Department of Education, Vocational Rehabilitation. It is signed by H. E. McGuire (who referred plaintiff to the Rehabilitation Institute) and dated February 16, 1962. It is stated therein that plaintiff was "Not accepted (screen-

ed out)" on a rehabilitation referral. The reason given for this action was "Impairment too severe".

Exhibits 30 and 31 were submitted by staff members of the Rehabilitation Institute, Kansas City, Missouri. Both exhibits are dated May 1, 1962.

Exhibit 30 is a social evaluation by caseworker Kathleen R. Morrow. Miss Morrow interviewed plaintiff and had the benefit of Exhibits 22, 26 and 28. Her casework impressions were as follows:

"*CASEWORK IMPRESSIONS:* As a result of my interview with Mr. Pollard and a review of the psychiatric and medical summaries, I conclude that Mr. Pollard has probably never made a particularly adequate adjustment, possibly always having been rather immature and perhaps somewhat overindulged by his mother. There does not appear to have been any sudden acute development of symptoms, but rather a gradual onset which may have been accelerated by the death of his mother and loss of some additional support in 1959. As Dr. Terrill has indicated, Mr. Pollard seems completely lacking in insight, and also firmly convinced that he is a very sick man, incapable of any more activity than he currently engages in. He reenforces his contention that employment would be difficult to obtain by pointing out his limited education, which is undoubtedly a reality factor. I am convinced that nothing is likely to make Mr. Pollard believe he is capable of handling employment or bring about any attempts on his part to look for other work. Further rejection by the family and denial of Social Security Benefits in my opinion will only heighten dependency needs and his efforts to secure the approval of his family and the community as well as possible appeals for Social Security Benefits. Mr. Pollard apparently feels his own physicians entirely support his claim of total disability and doubtless would be unable to accept other medical opinions. In conclusion, I would add that I doubt that the patient could make use of any rehabilitative program such as the Work Adjustment Program, since he would once more be pushed into repeatedly trying to demonstrate the extent of his physical limitations."

Mr. Bert Brant, Director, Jewish Vocational Service, Kansas City, Missouri, testified at the hearing. He stated that his organization has made a study of the placement of older workers and that medical reports are often received by the organization for use as an aid in estimating an older worker's capacity for work (Tr. 89); that he had examined Exhibits 1 through 33 (Tr. 90); that he had been present throughout the hearing and had observed plaintiff during the hearing. (Tr. 91)

Mr. Brant was then asked the following hypothetical question by the Hearing Examiner:

Based on your own past experience and your own educational background and your examination of the witness and examination of the exhibits, I should say, the information which you have obtained at the hearing, and your observation of the claimant, have you been able to form an opinion as to whether the claimant can perform with reasonable regularity any jobs in the American economy for the effective period of his application which is through December 25, 1961? Now, that means that he will have to be able to work either prior to December 25 of 1961, or not to have been able to work. Have you been able to form an opinion?"

Mr. Brant stated that he had an opinion (Tr. 94) and was asked to state it. (Tr. 94) In giving his opinion Mr. Brant did not refer to the specific time period he was asked about. He stated:

" * * * it is apparent that if you give this man a job tomorrow and said go ahead and go to work that he would be unable to do it. Yet, I have the feeling that looking at this case, that a combination of vocational and psychological treatment, there's a possibil-

ity of improving his condition so that he could work at substantial gainful employment.

"Q [By Hearing Examiner] Let me interrupt you just one minute. When you say 'psychological treatment,' what do you give these people? Reassurance, is that what it constitutes chiefly?

"A. I think the chief things are some planning and a program of activity. Now, as a vocational counselor, I don't give psychological diagnosis or psychiatric treatment. We work with specialists who do this. Our particular part of the work is a program which goes in accordance with this, and I think there's a reasonable chance that this man might improve by treatment, that he might be able to work in substantial employment."

The Hearing Examiner then asked Mr. Brant what kind of activities plaintiff might engage in, assuming that there was a reasonable chance that plaintiff might improve by treatment and that plaintiff might be able to work in substantial employment. (Tr. 96) Mr. Brant testified that plaintiff could not farm or work in trucking as he had previously done, but that plaintiff could work as a sales person in a farm implement store, a hardware store, or a general family clothing store; that some type of light general maintenance work could be done by plaintiff; that light general maintenance work was available in apartments, schools and county buildings (Tr. 96, 97); that post office work or a light assembly job in a factory would require too much speed for plaintiff (Tr. 97); that plaintiff could not drive a cab where he would be getting out in cold weather (Tr. 98); that he would have "some questions" on all jobs requiring speed, such as inspecting bottles in a bottling plant. (Tr. 98)

Mr. Brant further testified that an anxiety reaction is present in all problems of vocational placement; that it is caused by unhappiness and anxiety about not being able to engage in activity; that sufficient anxiety can cause a loss of control; that job activity will improve such a condition.

The cross-examination, with interspersed redirect examination, was quite detailed. For our purposes it is sufficient to say that it was clearly demonstrated that Mr. Brant's opinion that plaintiff might be rehabilitated rested on one proposition: that work activity might improve plaintiff's physical and mental condition. Mr. Brant stated that asthma is frequently associated with emotional conditions and that "Sometimes when the emotional conditions improve, the asthma improves; that the asthma condition would not be removed, but it would be improved". (Tr. 122) Mr. Brant was not qualified as a medical or mental expert.

## DECISION OF HEARING EXAMINER

In his decision the Hearing Examiner first summarized the administrative history of this case. He then described the issues as follows:

"The issues for decision are whether the claimant is entitled to disability insurance benefits under section 223 (a) of the Social Security Act, as amended, and whether a period of disability may be established under section 216(i) of such Act. The issues are dependent upon specific findings as to whether during the effective period of the application, filed September 25, 1961, and while the special earnings requirements were met, the claimant was under a disability in that he was unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration and, if so, the beginning date of such disability. The claimant met the special earnings requirements during the effective period of the application, and continues to meet such requirements through June 30, 1962. Thus, on the basis of his application filed on September 25, 1961, the evidence must es-

tablish that the claimant was under a disability as defined in the Act beginning on or before December 1, 1961, for entitlement to disability insurance benefits, and on or before December 25, 1961, for establishment of a period of disability."

Thereafter the Hearing Examiner referred to the applicable statutes and reviewed the evidence in considerable detail and concluded the decision with the following:

"Claimant is an extremely poor historian as far as reliability of his own medical condition. There is nothing whatsoever in any medical report to substantiate any heart condition, either mild, moderate, or severe. None of the claimant's doctors mentioned any heart condition. The only time that anything is mentioned is in the statement of Dr. Calovich which gives a diagnosis of 'essential hypertension' which actually means that although the claimant's blood pressure may have been elevated when Dr. Calovich took it, that there have been no end organ results and therefore the claimant does not have hypertensive heart disease.

"The claimant does have a mild pulmonary problem. Dr. Calovich states that he has chronic rhinitis, a mild degree of bronchitis, a mild degree of pulmonary emphysema, and fibrosis. He also has some bronchial asthma. The asthma seems to be fairly well controlled. When an individual has a pulmonary problem, the only way that it can be measured is through some sort of a functional test. Pulmonary function tests were performed by Dr. Calovich and the results indicate that the claimant has quite adequate capacity in order to carry on normal functions and *also work activity*. Dr. Calovich said from indications of the claimant's personal marital activities that he does not appear to be severely limited and this would indicate that the claimant's alleged weakness is not so much organic as actually a mental disturbance. The respiratory functions are to breathe and of the blood stream to absorb oxygen and dispose of carbon dioxide. This function does not appear to have been very greatly interferred with by any of the claimant's alleged problems.

"It is obvious to anyone who has studied this file that the claimant's problems are on a functional basis. In Exhibit 25, there is a statement to the effect that if benefits were paid directly to the claimant, he would spend too much of his money on unnecessary medical visits. Dr. Terrill, who is a phychiatrist, stated that this claimant is oriented in all spheres and alert. There is no gross evidence of thought disorder, delusions, or hallucinations. There is no evidence of memory disturbance. His diagnosis was severe psychoneurotic reaction and a passive-dependent personality. He also stated that the claimant *does not have a great deal of motivation so long as the claimant's wife is working and the sons are taking over the chores, since he then can maintain his illness and save face with the community*. Dr. Terrill does not believe that a hospitalization would be of much value and feels that some sort of employment outside a hospital would help the claimant overcome his mental problems. In other words, work activity would be of great therapeutic value to the claimant and it is common knowledge to anyone that this is the type of system that is followed in mental institutions where the patients are given occupational therapy.

"In determining the effect of psychoneuroses, consideration is given to whether the psychoneurosis has resulted in severe social, personal and occupational regression or confinement to a mental hospital and whether it persists despite appropriate treatment. The manifestations of tension, anxiety, depression or psychophysiological disturbances, behavioral disturbances, hysterical reactions or obsessive compulsive patterns should be carefully described. An adequate psychiatric

examination is generally necessary. (C.F.R. 404.1519(c) (2) (ii))

"The claimant does not appear to be well motivated and he is trying to justify his inability to cope with economic situations by alleging serious restrictions on his ability to work. Actually, he does not have any and there is nothing to prevent this claimant from working in many types of activities. The vocational witness testified that the claimant could perform the work of a sales person in a hardware store or general family clothing store. He could do general maintenance work such as required in an apartment house, school, or county building. The vocational witness further testified that the anxiety reaction is not uncommon for a person like claimant and that inactivity instead of being helpful is very harmful to this type of condition. Mrs. Pollard testified that the claimant continually paces back and forth and is restless. If claimant was performing some work to ease his condition, he wouldn't have to expend his energy pacing the floor and could use this same amount of energy in working.

"In light of the entire evidence of record and of the foregoing considerations, the hearing examiner finds that the claimant has not established that he has impairments, either singularly or in combination, of such severity as to preclude him from engaging in any substantial gainful activity at any time for which his application of September 25, 1961, was effective. It is the decision of the hearing examiner that the claimant is not entitled to disability insurance benefits or to a period of disability under sections 223(a) and 216 (i) of the Social Security Act, as amended."

## SCOPE OF JUDICIAL REVIEW

Judicial review of a final decision by the defendant is limited in scope. In such review ordinarily not more than seven questions are before the reviewing court.

(1) Were the hearing procedures fair and lawful? Jacobson v. Folsom (S.D.N.Y.) 158 F.Supp. 281, 284.

(2) Was evidence received on the material factual issues? Fenix v. Celebrezze (W.D.Mo.) 243 F.Supp. 816.

(3) Are the findings of fact supported by substantial evidence? Celebrezze v. Bolas (C.A.8) 316 F.2d 498, 500–501.

(4) Are the findings of fact sufficient to resolve the crucial issues? Hayes v. Celebrezze (C.A.5) 311 F.2d 648, 654.

(5) Were correct legal standards applied to the facts found in determining the ultimate issues? Ferran v. Flemming (C.A.5) 293 F.2d 568, 571.

(6) Were all regulations of defendant applied in arriving at a decision lawful and valid as applied in this case? Marion v. Gardner (C.A.8) 359 F.2d 175.

(7) In finding the facts does it appear that the claimant was required to sustain no greater burden of proof than proof by a preponderance of the evidence, the usual burden in administrative proceedings? Sec. 7(c) Administrative Procedure Act. Sec. 7(c), Title 5, U.S.C.; Jaffe, Administrative Law: Burden of Proof and Scope of Review, 79 Harvard Law Review 914; Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966).

## CONCLUSIONS OF LAW

Only if all the seven questions stated above as being within the scope of judicial review are answered in the affirmative should the final decision of the defendant be affirmed and his motion for summary judgment be granted.

At the outset it would be noted that plaintiff, technically, has the burden of establishing his claim by a preponderance of the evidence. Bolas v. Cele-

brezze, supra; Woodby v. Immigration and Naturalization Service, supra.

■ First plaintiff contends that the hearing procedures were not fair. The only portion of the hearing complained of is the cross examination of Mr. Brant. The transcript of that cross examination does not reflect that the Hearing Examiner exceeded the bounds of his authority or discretion, or was unfair. So the answer to the first question, "Were the hearing procedures fair and lawful?", should be answered in the affirmative. This does not mean that all the evidence of Mr. Brant is material and substantial.

The next question that will be discussed is whether there is substantial evidence to support the Hearing Examiner's findings of fact. In Marion v. Gardner, supra, it is stated in substance that the findings of fact contained in a final decision of the defendant and the reasonable inferences drawn from them are conclusive if they are supported by substantial evidence; that substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; that the determination of the presence of substantial evidence is to be made on a case-to-case basis and on the record as a whole.[1]

The Hearing Examiner's ultimate conclusion was that plaintiff "has not established that he has impairments, either singularly or in combination, of such severity as to preclude him from engaging in any substantial gainful activity at any time for which his application of September 25, 1961, was effective", i. e. on or before December 1, 1961, for disability benefits and on or before December 25, 1961, for a period of disability.

The conclusion of the Hearing Examiner that plaintiff has failed to establish his claim is not a finding of fact, but a legal conclusion which is not supported

by the record. It will hereafter be demonstrated that there is sufficient evidence in the record to establish plaintiff's claim by a preponderance of the evidence. So the Hearing Examiner's ultimate finding will be treated as a finding that plaintiff did not establish factually that he had impairments, either singularly or in combination, of such severity as to preclude him from engaging in any substantial gainful activity on or before December 1 or 25, 1961, rather than a finding that plaintiff failed to establish such a claim.

■ At this point it should be noted that all of the exhibits in the record which relate to plaintiff's physical and mental condition were prepared within one year of the period in question. There is nothing in those exhibits or the record to indicate that there was, in the relevant period, any change in plaintiff's condition. The Hearing Examiner did not in reviewing the evidence expressly attribute any material significance to the dates on which plaintiff was examined by physicians. However, according to plaintiff's testimony at the hearing he was not troubled by arthritis in his right elbow or pain in the area of his chest during the effective period of his application. So the evidence with respect to his right elbow and chest pain should be disregarded in this review. The remainder of the evidence before the Hearing Examiner is relevant to plaintiff's mental and physical condition during the relevant period of his application and will be considered.

The situation with respect to plaintiff's respiratory condition is this. The report of Dr. Johnson, if not controverted, establishes that plaintiff is a primary respiratory invalid and that his condition is static. Dr. Warren's reports do not contradict the report of Dr. Johnson. Dr. Warren states that plaintiff's respiratory condition places general restric-

---

1. Sec. 405(g) Title 42 U.S.C.A.; 4 Davis, Administrative Law Treatise §§ 29.02 and 29.03, pp 118–130. If reasonable minds (or reasoning minds) could not differ on the factual finding the court should not hesitate to make the finding. On the other hand the administrative finding of fact should not be disturbed if the finding is one that may be reasonably found or inferred from substantial evidence or the lack of evidence to meet the burden of proof.

tions on his physical activity and that the condition is static.

With respect to plaintiff's mental condition, in the report of Miss Eyles, a psychologist, consulted at defendant's instance, it is stated that plaintiff is not apt to become very productive in a job setting.

Dr. Terrill reported that plaintiff is obsessed with his neurotic feeling about his health and how he must care for himself. Dr. Terrill characterized plaintiff's problem as severe psychoneurotic reaction in a passive-dependent personality. It was Dr. Terrill's opinion that plaintiff was quite limited by his illness and that the neurotic problems were so deeply rooted that his prognosis for recovery was guarded. The caseworker, Miss Morrow, stated that she was convinced that nothing is likely to make plaintiff believe he is capable of handling employment or bring about any attempts on his part to look for work.

The opinion of Mr. Brant, the vocational witness of the hearing, was that "if you give this man a job tomorrow and said go ahead and go to work that he would be unable to do it". While that opinion was given in 1964, it was based primarily on the February 1962 opinions of Drs. Terrill and Calovich. Mr. McGuire, a vocational rehabilitation counselor, would not accept plaintiff for rehabilitation for the stated reason that his impairment was too severe.

From the evidence favorable to plaintiff summarized above, it is concluded that there is sufficient evidence in the record to establish plaintiff's claim and that judgment should be entered for plaintiff unless there is substantial evidence to support the Hearing Examiner's express or fairly implied finding of fact upon which his ultimate conclusion is based.

The Hearing Examiner found as a fact that the claimant had a pulmonary problem ("mild"), a "mild degree" of bronchitis, a "mild degree of pulmonary emphysema and fibrosis", "some bronchial asthma", and a "severe psychoneurotic reaction and a passive dependent personality".

In determining whether the whole record established that the "impairments of claimant singularly or in combination are of such severity as to preclude him from engaging in any substantial activity at any time" for which his application was effective, the Hearing Examiner relied upon the following conclusions, arrived at by him:

(1) Pulmonary tests of Dr. Calovich indicate that claimant has adequate capacity to carry on the respiratory functions of breathing and absorbing oxygen and disposing of carbon dioxide;

(2) Claimant's problems are on a functional basis;

(3) Claimant is trying to justify his inability to cope with economic situations by alleging his restrictions on his ability to work, which he knows are not present;

(4) Employment or work would "help claimant overcome his mental problems", in other words, "work activity would be of great therapeutic value to the claimant"; "it is common knowledge that this is the type of system that is followed in mental institutions where the patients are given occupational therapy"; therefore claimant has no serious restrictions on his ability, and there is nothing to prevent claimant from working in many types of activities;

(5) Claimant's "personal marital activities" (presumably sexual) do not appear to be severely limited.

Finding (1) above is not decisive on the issue standing alone or in combination with other evidence relied on. Dr. Calovich did say that plaintiff on the basis of his organic problems is not totally disabled from performing gainful activity, but he did not consider plaintiff's complicating nervous and mental problems.

In passing it should be noted that total disability is not the degree of disability required by Sections 416(i) (1) and 423(c) (2); and that activity can be

gainful without being substantial. "Substantial gainful activity" used in the definition of disability in Section 416(i) (1) of Title 42, U.S.C.A., means activity both substantial and gainful for which a reasonable opportunity is available. The results of the exercise and pulmonary function tests interpreted by a qualified medical expert are not on this record substantial evidence upon which to base a finding that plaintiff has an adequate capacity for substantial and gainful work activity, for which a reasonable opportunity is available. Cf. Cook v. Celebrezze (W.D.Mo.) 217 F.Supp. 366, 368, 369. An insane man, or an unconscious man, may have fairly good pulmonary function.

There are two problems with respect to finding (2) above considered alone or in combination with any other combination of permissible findings. First, the finding that plaintiff's ability to breathe has not been greatly interfered with by any of plaintiff's problems is without critical significance for the same reason finding (1) above is without critical significance. Second, the ability of plaintiff's bloodstream to absorb oxygen and dispose of carbon dioxide was not measured by the proper standards of disability under Section 416(i) (1) so far as one can determine from the record. If the ability was measured the result of the test was not interpreted by an expert under proper statutory standards of disability. Apparently the Hearing Examiner may have been influenced in giving great significance to the ability of plaintiff's bloodstream to absorb (or consume) oxygen by an uncited regulation of defendant which relates to impairments of the respiratory system. 20 C.F.R. § 404.1513. This regulation declares that the preferred method for determining an individual's capacity to do work is to test his ability to consume oxygen in these words:

"§ 404.1513 *Impairments of the respiratory system.*

"(a) *General.* Respiratory impairments are usually the result of such common respiratory diseases as pulmonary tuberculosis, emphysema, pneumoconiosis (such as silicosis or anthracosis) and bronchiectasis (a disease causing localized dilation of the air passages). Pulmonary fibrosis, which may be a sequela of such diseases or a primary disease in itself, may interfere with either ventilation or diffusion. In these diseases (except for pulmonary tuberculosis, see paragraph (b) of this section), impairment generally results from the inability of the respiratory mechanism to supply sufficient oxygen to meet energy demands. The extent of impairment depends upon the degree of interference with oxygen supply. Oxygen is transported to tissues through three separate functions: Ventilation, diffusion, and circulation. Most, if not all of the above diseases, may interfere with one or more of the separate functions. The effect of ventilation impairments is determined on the basis of history, physical examination and suitable laboratory tests. In most instances hematocrits and X-rays are needed. Vital capacity and timed capacities (maximum breathing capacity), are the preferred tests for helping to determine the extent of remaining capacity to ventilate. Some diseases impair diffusion capacity, i. e., ability of oxygen to pass across the lung membrane into the blood stream. In others, the circulatory bed of the lung may also be reduced. In a few of these conditions, there may be normal, or relatively normal, ability to maintain air flow in and out of the lung (ventilation) but the capacity to pass oxygen across the lung membrane (diffusion) and have it carried away by the blood stream (circulation) is reduced. *The preferred method for determining the individual's capacity to do work is to test his ability to consume oxygen, which measures all three functions: Ventilation, diffusion, and circulation.*

\* \* \* \* \* \*

"(c) *Other conditions resulting in pulmonary insufficiency.* In cases of pneumoconiosis, emphysema, bronchiectasis, or pulmonary fibrosis, the medical information should show the

anatomical and physiological results of the conditions to permit assessment of the extent to which activity, such as walking several blocks slowly, doing small chores, etc., produces symptoms of pulmonary insufficiency, e. g., easy fatigability or shortness of breath. In appropriate cases the medical information should include the results of tests which actually demonstrate the individual's remaining respiratory capacity such as ventilatory tests, blood gas studies *and tests of ability to consume oxygen.*" (Emphasis added.)

■ To the extent that his regulation is employed to rebut evidence in the record supporting statutory disability and to restrict the consideration of other substantial competent evidence, its application in this case is invalid. Marion v. Gardner, supra, 359 F.2d at 181. The *Marion* case very soundly makes it clear that the defendant cannot by regulation either (1) narrow the breadth of the statute defining disability or (2) create a presumption which substantial credible medical evidence cannot overcome.[2]

Finding (3), read in context, is without support in the record. There is no evidence in the record to support a reasonable inference that plaintiff is alleging restrictions on his ability to work which he knows are not present. To the contrary, all the substantial evidence on the issue supports the plaintiff's claim (including the evidence of Dr. Terrill, the psychiatrist, and Miss Eyles, the psychologist, employed to evaluate the claim) that plaintiff is unaware of the relation of his mental condition to his behavior.

Finding (4) is also without support in the record. It has already been demonstrated with respect to finding (1) that there is no substantial evidence that plaintiff is not totally disabled within the statutory definition. The Hearing Examiner relied, at least in part, on the testimony of the vocational witness, Mr. Brant, in making finding (4). The prob-

lem with that reliance is that Mr. Brant did not testify as the Hearing Examiner stated. Mr. Brant testified in substance that plaintiff could not work as a farmer or trucker; that there was a reasonable chance that a combination of vocational and psychological treatment might improve plaintiff's condition to the point that he could work as a sales person in certain retail sales stores or do light general maintenance work; that light general maintenance work was available. In summary, Mr. Brant's testimony was that plaintiff could not work during the effective period · of his application, which testimony cannot be construed as substantial evidence for the Hearing Examiner's contrary finding. Furthermore, Mr. Brant's qualifications to contradict qualified medical opinion do not appear in the record.

Finally, in respect to finding (5) it should be noted that the fact (if it be a fact) that claimant's personal marital activities are not "severely limited" is not a basis for denying his application on the facts of this case.

■ It has now been demonstrated that there is substantial evidence in the record to support a finding by a preponderance of the evidence that during the effective period of his application plaintiff was unable to engage in any substantial gainful activity by reason of medically determinable physical and mental impairments which can be expected to be of long-continued and indefinite duration. It has been further demonstrated that there is no substantial evidence in the record to support the Hearing Examiner's finding that plaintiff did not have either physical or mental impairments (or both) of such severity as to preclude him from engaging in any substantial gainful activity for which an opportunity was available during the effective period of his application. Because of the limited scope of the Hearing Examiner's ultimate finding, the question of the proba-

---

2. Since this memorandum opinion was prepared, the Court of Appeals for the Fourth Circuit has held a regulation, 20 C.F.R. § 404.134, invalid as applied in a particular case upon the same principle followed in this memorandum. Leftwich v. Gardner (C.A.4, May 1, 1967) 377 F. 2d 287.

ble duration of plaintiff's mental and physical condition was not reached by the Hearing Examiner. For that reason it must now be determined whether this cause should be remanded to the defendant for consideration of this issue or whether this issue should be determined by the Court.

If plaintiff's physical condition was the sole controverted issue the cause would be remanded to defendant with directions to make further findings of fact in respect to the physical limitations imposed on plaintiff by reason of his physical condition. It would be suggested that the ability of plaintiff's respiratory system to absorb oxygen and dispose of carbon dioxide be tested if such a test has not been performed before making those further findings. Defendant would further be directed to give no weight to results of laboratory tests which have not been interpreted by a medical expert.

█ It is felt however, that on this record the plaintiff has met the burden of proof by a preponderance of evidence that plaintiff's mental condition in combination with his physical impairments is a disability as defined in Sections 416 (i) (1) and 423(c) (2). The opinions of Dr. Thomas, Dr. Terrill, Dr. Warren and Miss Eyles constitute all of the expert opinion evidence that can be considered with respect to plaintiff's mental condition. All of these opinions have been heretofore summarized and will not be repeated. None of them is adverse to plaintiff's claim. It is recognized that expert opinion on the ultimate question of the extent of disability is not binding upon the defendant. Domann v. Secretary of Health, Education and Welfare (W.D.Mo.) 220 F.Supp. 252, 259. However, it is also recognized that a finding contrary to uncontroverted expert opinion should be set aside as being conjectural and not supported by substantial evidence and speculative. Domann v. Secretary of Health, Education and Welfare, supra, at 259 and 260. The opinion of Mr. Brant that work activity would improve plaintiff's mental condition has been given no weight because Mr. Brant is not shown to have the expertise necessary to entitle his opinion to be given weight on this issue and because the standards of disability of the statute were not employed by Mr. Brant. In that regard it is noted that Exhibit 33, a letter dated January 6, 1964, from the Hearing Examiner to Mr. Brant requesting that Mr. Brant present testimony as a vocational expert at the hearing held in this cause, contains this statement: "You will not be requested to express any opinion respecting the claimant's physical or mental impairments or his residual dysfunction, since these are matters calling for medical expertise".

The opinions of Dr. Terrill and Miss Eyles both contain statements to the effect that work activity would be beneficial to the plaintiff. The Hearing Examiner found that work activity would be of great therapeutic value to the plaintiff. The question in this case is whether plaintiff during the period in question was disabled, not if he could work, if his mental condition might thereafter through therapy improve. According to Dr. Terrill, plaintiff's prognosis for recovery is guarded. Miss Eyles stated that plaintiff gives little indication that he would prove to be acceptable from a treatment standpoint.

From the foregoing discussion it appears that the answer to the seven questions set out above under "Scope of Review" is as follows:

Question (1): Yes.

Question (2): Yes.

Question (3): No.

Question (4): Yes.

Question (5): No.

Question (6): No.

Question (7): No, by virtue of apparent application of C. F.R. § 404.1513 invalid as apparently applied in this case.

Three of the critical questions are answered negatively. One appears to be answered negatively. A negative answer to any one would require reversal. The re-

versal herein is supported independently by each negative answer.

It is concluded with respect to disability resulting from plaintiff's mental condition considered in connection with his uncontroverted physical and mental impairments that there is no substantial evidence in the record to support the finding that he is not disabled within the meaning of Section 416(i) (1) of Title 42, U.S.C.A. The decision of the defendant denying plaintiff's application for a period of disability and/or disability insurance benefits will be reversed and this cause will be remanded to the defendant with directions to allow plaintiff's claim. The onset date of plaintiff's disability is found to be April 15, 1961.

For the reasons heretofore stated, it is hereby

Ordered that defendant's motion for summary judgment be, and the same is, hereby, denied. It is further

Ordered that the decision of the defendant be, and the same is hereby, reversed. It is further

Ordered that this cause be, and the same is hereby, remanded to the defendant with instructions to allow plaintiff's claim. It is further

Ordered that the motion for attorney's fee of counsel for the plaintiff in the sum of 25% be, and it is hereby, denied. It is further

Ordered that the check or checks issued in payment of the benefits herein ordered paid include the name of Edward L. Simmons as payee who is hereby determined to be entitled to an attorney's fee. Sparks v. Celebrezze (C.A.5) (D.C.Tex.) 228 F.Supp. 598, aff. 342 F.2d 286. It is further

Ordered, adjudged and decreed that defendant grant plaintiff's application for a period of disability and for disability benefits filed September 25, 1961, and that 25% of the total of benefits of only the plaintiff Lloyd C. Pollard past due as of the filing date of this memorandum opinion, order and judgment be, and it is hereby, allowed to plaintiff's attorney, Edward L. Simmons.