Emmit W. SPAULDING, Plaintiff,

v.

Joseph A. CALIFANO, Jr., Secretary of
Health, Education and Welfare,
Defendant.

Civ. A. No. 75CV690–W–4.

United States District Court,
W. D. Missouri, W. D.

March 7, 1977.

W. Dudley Leonard, Independence, Mo.,
for plaintiff.

Robert G. Ulrich, Asst. U.S. Atty., Kansas
City, Mo., for defendant.

ORDER DENYING DEFENDANT'S MO-
TION FOR SUMMARY JUDGMENT
AND GRANTING PLAINTIFF'S MO-
TION AND JUDGMENT DIRECTING
THE AWARD OF DISABILITY BEN-
EFITS TO PLAINTIFF FOR THE PE-
RIOD FROM OCTOBER 22, 1973,
THROUGH AUGUST 20, 1975, THE
DATE OF THE DECISION OF THE
APPEALS COUNCIL

ELMO B. HUNTER, District Judge.

This is an action for review, under the
provisions of § 405(g), Title 42, United
States Code, of a decision of the defendant
Secretary of Health, Education, and Wel-
fare, granting plaintiff disability benefits
for the period from August 14, 1972,

through October 22, 1973, but denying him disability benefits for the period from October 22, 1973, through August 20, 1975.[1]

Under the governing provisions of § 405(g), *supra*, it is the function of the court to review the administrative record, basically to determine whether there is substantial evidence to support the decision of the Secretary. That section pertinently provides that:

"The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . . The court . . . may, at any time, on good cause shown, order additional evidence to be taken before the Secretary, and the Secretary shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm his findings of fact or its decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and a transcript of the additional record and testimony upon which his action in modifying or affirming was based."

Under the provisions of § 423(d)(1), Title 42, United States Code, disability is defined as the inability by reason of a medically determinable physical or mental impairment to engage in any substantial gainful employment for a period of 12 months or more.[2]

Therefore, the paramount question to be resolved by the court in this action is whether the administrative record contains substantial evidence to support the Secretary's determination that, after October 22, 1973, plaintiff no longer suffered from a medically determinable physical or mental impairment of such severity that he could not engage in substantial gainful activity.

### The Administrative Record

The evidence which was adduced in the administrative proceedings shows that, in 1965, plaintiff was working for Armco Steel Corporation as a millwright, in which capacity he was responsible for keeping certain machinery in good working order. (Tr. 51–53.) He was working with a heavy wrench which weighed about 40 or 50 pounds when the wrench slipped out of position. This caused plaintiff to twist, fall, and injure his lower back (Tr. 64). He was examined by Donald K. Pieper, M.D., an orthopedic surgeon. Dr. Piper noted that plaintiff had "aching pain in the low back with some radiation into the hips and thighs principally the right"; that he had "a Grade 1 spondylolisthesis at L5 on S–1"; and that, when conservative treatment failed, "[t]he posterior element of L–5 was [surgically] removed and a lateral Hibbs combined fusion of L4–5, S–1 was accomplished." (Tr. 193.)

After release from the hospital in March 1966, plaintiff returned to his usual duties as a millwright. As Dr. Piper later report-

1. In this action, the administrative decision is challenged only insofar as it denies benefits for the latter period. In substance, then, the review in this action is of the decision of the Secretary to terminate benefits as of October 22, 1973. See *Miranda v. Secretary of Health, Education, and Welfare*, 514 F.2d 996 (1st Cir. 1975). The standards of review, however, are the same as they are when the initial disability determination is reviewed. The "substantial evidence test laid down in 42 U.S.C. Section 405(g)" applies, and the question to be resolved by the court is whether there is substantial evidence to support the Secretary's decision that "claimant has improved to the point of being able to engage in substantial gainful activity". *Id.* at 998.

2. A social security disability claimant "must satisfy three separate tests. First, he must have a medically determinable physical or mental impairment which can be expected to result in death or can be expected to or has lasted for a continuous period of at least twelve months. Second, he must be unable to engage in any substantial gainful activity. Third, the inability to engage in gainful activity must be the result of the impairment or impairments. *Timmerman v. Weinberger*, 510 F.2d 439 (8th Cir. 1975); *Yawitz v. Weinberger*, 498 F.2d 956 (8th Cir. 1974); *Garrett v. Richardson*, 471 F.2d 598 (8th Cir. 1972)." *Burns v. Weinberger*, 394 F.Supp. 1179, 1187 (W.D.Mo.1975).

ed, "[h]e continued to complain of pain in his back, right leg and foot with a feeling of 'numbness' in his foot. He was given a final disability evaluation of eighteen to twenty-three percent by this office in April of 1966." (Tr. 183.)

In June of 1972, the plaintiff reported an escalation in the degree of pain which he was suffering "in his neck as well as in his back with radiation into the right foot [with] a burning scalding pain in the right foot [and] a constant aching pain [in his back] even at rest." (Tr. 183.) This culminated in his being admitted to St. Joseph's Hospital on August 14, 1972, where x-rays revealed "first degree spondylolisthesis and motion at all joints" and a diagnosis of "pseudoarthrosis of his old spine fusion." (Tr. 152.) He was discharged from the hospital on August 25, 1972, for another trial effort to return to work. (*Id.*)

Plaintiff experienced continued severe pain, however, and, therefore, on October 1, 1972, he was readmitted to St. Joseph's Hospital, where an anterior lumbar fusion of L–5 and S–1 was performed. The reports of record describe the operation as successful and plaintiff's postoperative convalescence as uneventful. (Tr. 156–159.)

Subsequently, however, plaintiff's convalescence appeared to progress slowly and his recovery was anything but complete. In his letter of February 20, 1973, Dr. Piper reported that:

"This man is now four months postoperative anterior fusion of the lower lumbar segment. He states he is feeling well, he is having no significant distress and clinically demonstrates a fair range of motion, active and balanced reflexes and negative stretch signs.

"X-rays of the lumbosacral spine show obliteration of the lumbosacral interspace by virtue of the anterior interbody fusion. Bending films show no motion of the lower three lumbar segments. This probably represents some splinting of voluntary nature.

"I think the man may be able to return to work in about two months and we will check him again before that time."

Subsequent examinations of plaintiff were made by Dr. Piper on the dates of June 18, 1973, and July 2, 1973, however, and it was determined that plaintiff was still unable to return to work. In fact, it was the conclusion of Dr. Piper on the latter occasion that:

"I am inclined to agree that he will not return to work. *He probably has somewhere in the neighborhood of forty percent permanent partial disability.*" (Emphasis added.) (Tr. 163.)

Ultimately, on October 22, 1973, at the request of the Department of Health, Education, and Welfare, Harry B. Overesch, an orthopedic surgeon, examined plaintiff. His principal finding was that, based on x-rays, "there does not appear to be any motion taking place at the lumbosacral articulation"; that "[t]his joint is narrowed"; and that, "although the joint spaces are not obliterated, it is felt that there is not a lot of motion taking place." (Tr. 165.) Dr. Overesch concluded that plaintiff suffered "a congenital abnormality of the low back, namely, a spondylolisthesis,"[3] but that he "has what is for all intense [sic] and purposes is a fairly stable fusion at that joint necessitating two surgical approaches posterior and anterior body." (Tr. 165.) It was Dr. Overesch's opinion that:

"this patient is not totally disabled but he is disabled for doing heavy work or moderately heavy work or work which would involve ladder climbing or repeated bending, stooping, lifting and carrying. He would be able to carry out milder work or work that did not involve these above restrictions." (Tr. 166.)

The physicians who examined and treated plaintiff after October 22, 1973, further, unanimously found plaintiff's surgery not to have completely cured his back defect and found plaintiff still to suffer limitations of motion and pain which would assuredly prevent his returning to his former employment as a millwright.

---

**3.** "Spondylolisthesis" is defined as a "forward displacement of one vertebra over another."

See *Dorland's Illustrated Medical Dictionary*, p. 1458.

Thus, Richard M. Childs, M.D., who examined plaintiff on November 12, 1973, primarily to ascertain his psychiatric condition,[4] reported plaintiff's statement that he continues to suffer debilitating pain which prevents any activity[5] and plaintiff's apparently genuine fear of undergoing another surgical operation. (Tr. 167.) Dr. Childs observed that plaintiff "seemed in good physical health except that he sat stiffly on the edge of the chair as if his back were painful" and that plaintiff's "chronic low back pain" complicated his "mild to moderately severe anxiety neurosis," but he was uncertain whether plaintiff "is presently totally disabled due to a psychiatric disease."[6]

In November 1973, according to a later report of Thomas F. Alderman, M.D., plaintiff's "severe and disabling back pain with radiation into the lower extremities" was compounded by the development of "a penetrating duodenal ulcer which (confirmed by X-ray), I believe was due in most part to the frequent ingestion of many analgesics, especially aspirin compounds." It was Dr. Alderman's opinion "that Mr. Spaulding is unable to perform gainful work."[7] (Tr. 182.)

In his letter of March 27, 1974, Dr. Piper recited the history of plaintiff's back problem through the surgery performed in October 1972. Then, Dr. Piper went on to state that plaintiff's "post-operative course was slow and he was never able to return to work"; that "[h]e was unable to sit more than two or three hours he states at a time and must get up and move about a little bit"; that "examination shows somewhat limited back motion with reference to his age and physique"; that "[f]ingertips reach four or five inches below the knees in forward flexion"; that plaintiff has "[e]xtension, lateral and torsional motion through a fair range" but "[t]here is complaint of discomfort in these maneuvers" and "[t]here is local tenderness over the lower lumbar midline"; that "[r]outine manipulative back and leg tests cause some referred pain in the lumbar region"; and that "x-rays of the lumbosacral spine with bending films show no detectable motion at L5–S1 [and] [w]e assume that the fusion is solid." (Tr. 184.) Dr. Piper concluded that:

"this man has had several attempts to restore him to a work status. He has problems both function[al] and organic which I believe influence his status but it is difficult if not impossible to separate one from the other in a matter of degree. It is my opinion, however, that his status is such that he cannot return to physical work. I am unable to say with certainty that his psychological status would allow him to function at sedentary work even [if] some job within limits of his background training were available.

"In considering the above it is my opinion he has a permanent partial disability in the neighborhood of forty percent, rating the body as a whole." (Tr. 184–185.)

On January 4, 1975, Thomas F. Alderman, M.D., reported that "bending films were taken of [plaintiff's] spine . . . which revealed less than total fusion of L–4, L–5, L–S S–1 joints as well as spondylolisthesis of L–5 in relation to S–1"; that "[i]n summary Mr. Spaulding has marked

---

**4.** A psychiatric evaluation was undertaken apparently because, in a statement dated July 17, 1973, plaintiff reported that, for "6 months to a year," beginning in 1969, he was treated on an outpatient basis at the Western Missouri Health Center. (Tr. 143.)

**5.** Dr. Childs explicitly states, in part, that plaintiff "quit work . . . when his back problems (chronic pain, vertebral surgery twice) became so severe he could not continue." (Tr. 167.)

**6.** It is noteworthy that Dr. Childs ventures no assessment of the severity of plaintiff's com-

bined impairments, even though, as noted in the text of this memorandum, Dr. Childs observed that the "anxiety neurosis" which afflicts plaintiff is a "complication" of plaintiff's low back pain.

**7.** Cf. note 6, supra. Again, the relationship between plaintiff's combined impairments is noted by Dr. Alderman in his statement that the development of the duodenal ulcer "was due in most part to the frequent ingestion of many analgesics, especially aspirin compounds." (Tr. 182.)

disability because of the pathological state of his lower spine"; and that "I still believe he is unable to perform gainful work in reguards [sic] to his physical condition, training and experience." (Tr. 188.)

On May 20, 1975, Bernard M. Abrams, M.D., a neurologist, reported on an examination which he had recently conducted of plaintiff. He noted plaintiff's subjective complaints of pain, that "[h]e moves with some slowness on or off the examining table"; that "[o]n straight leg raising tests he has no aggravation of the sciatic nerve and the pain that is observed is attributable to shortening of the right hamstring"; that "[a]ll pain that is referred in this man appears to be referred from the posterior aspect of the right knee"; and that:

> "[t]his man's absolute prohibitions would be from doing very heavy lifting. He also might experience discomfort from prolonged standing, bending, or sitting in one place, but his absolute prohibition again would be against heavy lifting. This man is likely to be subject to fluctuating type course and may be better or worse at any given time. Since he has been essentially doing nothing prior to the time I saw him, he could be expected to be at his best at the present time." (Tr. 190.)

In the administrative hearing which was conducted on November 21, 1974, plaintiff testified that his age is 49; that he has the equivalent of a high school education (Tr. 41); that he received formal instruction for some two years in automotive and diesel engine repair (Tr. 48); that he worked on a carburetor assembly line in 1949–50 and repaired freight cars for a railroad line from 1950 to 1953 (Tr. 49–50); that, for the next 20 years, he did heavy[8] work as a millwright for the Armco Steel Corporation (Tr. 51–53); that, while employed at Armco, he was treasurer for the union, in which capacity he performed certain accounting and bookkeeping chores (Tr. 58–60)[9]; and that his pain is so constant that he can neither sit nor stand for long periods of time[10] (Tr. 72–73).

A vocational expert also appeared at the administrative hearing. He testified that, assuming that plaintiff were "capable of performing a job in a seated position, with the opportunity to move about from time to time, and doing light or sedentary work, involving the use of . . . his shoulders, and arms, and hands, and also, further involving the use or repair or the handling of small items of no consequential weight" (Tr. 99) and "predicated upon the man's age, his schooling, and his past work background" (Tr. 100), plaintiff could engage in substantial gainful activity as a motion picture projectionist, claims clerk, as an assembler, moulder, and repairer of small parts, as a clerk, as a cleaner of small metal parts, and as a security man. He further testified that these jobs exist in the area of Kansas City in great numbers.[11]

---

8. More particularly, plaintiff described his employment as a millwright as "hard work" and stated that he very frequently had to work in a "bent or stooped position . . . getting in at a certain piece of machinery." (Tr. 52.)

9. Plaintiff nevertheless testified that it was *not* his responsibility in this capacity to "keep the books to accurately reflect income or disbursements" and that "the Secretary did this" and "all I did was . . . just check to see if they balanced." (Tr. 59.)

10. This pain, according to plaintiff's testimony, prevented him from even carrying out the less demanding "shop work" while working as a millwright. Cf. note 8, *supra*.

11. The evidence respecting the vocational expert's qualifications tended to show that his expertise is in the field of psychology and reha-

bilitation rather than in the vocational field. (Tr. 177–181.) He had only once before testified as a vocational expert. (Tr. 108.) In testifying respecting the existence of the forms of employment which he deemed suitable for plaintiff, he rendered the opinion that, "in this city and in this region . . ., I don't feel like I could give you an accurate (estimate) of the number of jobs. I feel many, but then, if you asked for a specific number, like 600, 700, I don't think I could come up with an accurate number." (Tr. 105.) Later in the course of his testimony, the vocational expert testified: "I don't know the number of jobs in existence in the Kansas City area." (Tr. 110.) He further stated that the only basis for his testimony was that he "called the employment office two days ago, and as of then, these jobs were available in this area." (Tr. 106.)

*The Administrative Decision*

Accordingly, on December 4, 1974, the administrative law judge issued his decision to the effect that "claimant is entitled to a period of disability commencing August 14, 1972, through October 22, 1973," but that he was not disabled thereafter through the date of the hearing (Tr. 28). The principal finding upon which the decision was based was that:

"Physically and mentally, this man has the residual capacity to perform a job in a seated position, or alternately sitting or standing at his preference, working with his arms and hands, trunk movements unrestricted to the upper part of his body. During the hearing, Mr. Spaulding may have made some general complaints contradicting this statement to some minor extent. They are not supported by medical evidence, and although possibly a bit debatable, in effect, he agreed with this residual capacity."

Later, this finding was supplemented by an extensive evaluation of the evidence by the Appeals Council of the Social Security Administration to the following effect:

"In considering the medical evidence, the Appeals Council notes that based on the comprehensive consultative orthopedic examination conducted on October 22, 1973, Dr. Overesch found that the claimant retained the functional capacity to perform nonstrenuous physical work which did not involve, climbing, or repeated bending, stooping, lifting, or carrying. The Council is cognizant of the fact that as of May 1974, Dr. Piper did not feel that the claimant was employable. While it is true that Dr. Piper found some musculoskeletal abnormalities, in the opinion of the Council, they were not of such severity as to preclude light and sedentary work, particularly since there was evidence of a solid spinal fusion and no evidence of any neurological complications. The Council is also aware of Dr. Alderman's clinical findings in January 1975, which led him to the belief that the claimant was disabled. Based on his findings, the Council would have to agree that the claimant would be precluded from moderately strenuous work or activities involving prolonged standing, bending, or twisting at the waist. However, there is no indication, based on his findings or observations, for concluding that the claimant would be precluded from at least light and sedentary work. This belief is supported by the results of Dr. Abrams' comprehensive examination in May 1975 which did not reveal any significantly restricting musculoskeletal abnormalities. It is noteworthy that Dr. Abrams agreed with Dr. Overesch that the claimant was precluded from essentially strenuous physical exertion. Therefore, after considering the record as a whole, the Council concludes that from a musculoskeletal standpoint, the claimant has not been precluded since October 22, 1973, from engaging in those light and sedentary jobs enumerated by the vocational expert who testified at the hearing."

With that supplementation, the Appeals Council affirmed the decision of the administrative law judge in their decision issued on August 20, 1975.

*Judicial Review of the Administrative Decision*

 As noted above, it is the principal function of this court to determine whether the material findings of the Secretary are supported by substantial evidence. *Yawitz v. Weinberger*, 498 F.2d 956 (8th Cir. 1974), *Pollard v. Gardner*, 267 F.Supp. 890, 903 (W.D.Mo.1967). In this regard, the record plainly shows that there is no substantial evidence to support the material finding of the administrative law judge that plaintiff would be able "to perform a job in a seated position, or alternately sitting or standing at his preference, working with his arms and hands, trunk movements unrestricted to the upper part of his body." The uncontradicted evidence in the administrative record is to the contrary. In November 1973, Dr. Childs observed that plaintiff was able to sit only "stiffly on the edge of the chair as if his back were painful." On March 27, 1974, Dr. Piper reported that

plaintiff was unable to sit for more than two or three hours at a time without a substantial break in sitting. And plaintiff's testimony at the administrative hearing, rather than being "jumbled and evasive" on this issue (as the Secretary's brief characterizes it),[12] is clear to the effect that plaintiff cannot either sit or stand for any sustained period of time.[13]

■ Further, neither are the Appeals Council's supplementary findings to the effect that plaintiff, as of October 22, 1973, regained the residual capacity to perform all forms of "light" and "sedentary" work supported by any substantial evidence. For all of the medical evidence respecting plain-

tiff's condition from October 22, 1973, to the date of the decision of the Appeals Council—including the medical findings of Dr. Overesch—are to the effect that plaintiff is incapable of activity which would require repeated movements of his body ("bending," for example) over a period of time. Further, the findings of Drs. Piper, Alderman, and Childs show without contradiction that there was virtually no change in plaintiff's postoperative condition before October 22, 1973, and his condition thereafter. During both periods of time, he suffered severe limitations of body motion,[14] the inability to stand or sit on a sustained basis,[15] and constant low back pain which radiated to other parts of his body. Thus,

12. See page 6 of the "memorandum in support of defendant's motion for summary judgment," filed herein on January 27, 1976.

13. The testimony referred to as "jumbled and evasive" appears at pages 86 and 87 of the transcript of the administrative proceedings to the following effect:

"Q. Do you have any trouble sitting?
A. Well, I'm not comfortable all the time, sitting.
Q. How long can you sit before you have to get up and move around or change position?
A. I don't know. I'd say 'till, I don't, never timed myself. I just usually have to move around. Seems like moving around helps you."

This testimony, however, is internally consistent and to the effect that plaintiff is not comfortable sitting, as he plainly states, "all the time." And it is consistent with the medical evidence of record, which is recited in the text of this memorandum, to conclude that plaintiff can neither sit nor stand for prolonged periods of time without undue pain. Nor does this testimony provide any support for the administrative law judge's conclusion that plaintiff admits retaining the "residual capacity" to work with light objects while seated or, alternatively, while seated or standing. The medical evidence, furthermore, unanimously adverts to the pain which plaintiff feels upon any bending of his body. In his brief in the action at bar, the Secretary points to the following testimony as containing an admission by plaintiff that he retains the residual capacity to work while seated or while alternatively standing and sitting:

"Q. Did you have any difficulties with shop work?
A. Yeah, I was, I wasn't, I wasn't—I didn't feel good none of the time. I ended up going a long time. And, I'd do the—Yes, I'd have difficulty in doing, because I'd be hurting,

and but, now if some of the little work, some little work, like little work, that I could sit down on the bench, set the material on the bench and do, *would help me a lot. To be off my feet.*
Q. All right. Did you have any difficulty when you were sitting and working at the bench? Did you have any pain, at that time?
A. I, *it was some relief to be sitting.* It was some relief to get off my feet.
Q. All right. Could you sit for—How long could you sit in the shop and clean these parts? Without having—Would the pain subside, would it get worse, would it stay the same?
A. *It would help it, it would help it.*" (Emphasis added.)

The Secretary relies on the emphasized portions of the quoted testimony as constituting *the admission by plaintiff of his residual capac-*ity. Without more, however, this testimony is simply to the effect that plaintiff is better able to perform work with light objects than other work, but it is hardly, in itself, an admission that plaintiff regards himself as capable of performing "substantial gainful work" of this type. And, further, the testimony here relied upon is perfectly consistent with his testimony that he can neither sit nor stand for any protracted period of time.

14. Dr. Overesch, in examining plaintiff on October 22, 1973, observed that he could not perform "repeated bending, stooping, lifting and carrying." (Tr. 166). In his report of May 20, 1975, Dr. Adams stated that, at best, plaintiff would experience "discomfort from prolonged standing, bending, or sitting in one place." (Tr. 190.)

15. See note 14, *supra.*

he suffered practically the same limitation in function after October 22, 1973, that he did before that date. In fact, if any change after October 22, 1973, is suggested by the evidence, it is clearly one for the worse. The surgical fusion which was in 1973 thought to be effective and successful was discovered by Dr. Alderman in March 1974 to still be a source of great pain and limitation of motion;[16] and plaintiff, further, developed a duodenal ulcer (with additional pain); and a nervous condition of a severity which has not yet been accurately measured.[17] Further, all the physicians who treated and examined plaintiff after October 22, 1973, except Dr. Overesch and Dr. Childs (who did not purport to assess plaintiff's physical abilities), were unanimously of the opinion that his medically determinable physical impairment, alone, disabled him from engaging in any substantial gainful activity.[18] And Dr. Overesch's underlying findings substantially agree with those of the other physicians. His more optimistic conclusion cannot, therefore, without more, constitute substantial evidence to support the Secretary's decision.[19] To so hold would be to recognize and adopt the absurdity that a claimant's period of disability must end, if the objective findings and subjective symptoms of his condition do not change, but a physician is found who is willing to state that they do not preclude him from all forms of gainful activity.[20]

The evidence in the administrative record, however, unanimously shows that the limitations on plaintiff's function did not improve on October 22, 1973, or thereafter. Indeed, they were compounded by a constant pain of such severity that plaintiff was obliged to take analgesics in such quantity that he developed a duodenal ulcer and a nonpsychotic functional disorder of uncertain magnitude. When this subjective pain, duodenal ulcer, and functional disorder are considered in combination with the imperfectly-repaired spondylolisthesis, the evidence of plaintiff's disability from and after October 22, 1973, becomes overwhelming. The administrative law judge and the Appeals Council of the Social Security Administration both erred in failing to consider plaintiff's several impairments in combination, rather than separately, *Landess v. Weinberger*, 490 F.2d 1187, 1190 (8th Cir. 1974); *Haskins v. Finch*, 307 F.Supp. 1272, 1279 (W.D.Mo.1969), and in failing to consider plaintiff's subjective pain, which under the governing law, may alone constitute a disability. *Baerga v. Richardson*, 500

16. See Tr. 184. It is also noted in Dr. Piper's report of March 27, 1974, that plaintiff had had a prior "back fusion" in 1971.

17. See Tr. 182. Dr. Childs characterized plaintiff as having a "chronic but mild to moderately severe anxiety neurosis," but found it "difficult" to determine whether he could be considered "totally disabled" solely due to a psychiatric disease. (Tr. 168.)

18. Thus, Dr. Alderman stated on March 12, 1974: "It is my opinion that Mr. Spaulding is unable to perform gainful work." (Tr. 182.) Dr. Piper stated on March 27, 1974: "It is my opinion . . . that his status is such that he cannot return to physical work," the only type of work in which plaintiff had any experience. Dr. Alderman again stated under the date of January 27, 1975, that, based on his examination of plaintiff on December 30, 1974, "I still believe he is unable to perform gainful work in regard to his physical condition, training and experience." (Tr. 188.) And Dr. Abrams, on May 20, 1975, expressed the opinion that plaintiff "absolutely" could carry out no heavy lifting and that, even at his best,

could not bend, stoop, or sit or stand for prolonged periods of time. (Tr. 190.)

19. A medical opinion which purports to state the type of activity in which plaintiff can participate (or, more generally, whether or not plaintiff is able to engage in substantial gainful activity) is acceptable only insofar as it is supported by medically approved clinical or laboratory diagnostic data. See *Sykes v. Finch*, 443 F.2d 192 (7th Cir. 1971). Dr. Overesch's *clinical* findings support *plaintiff's* claim of disability in that they show that plaintiff cannot be expected to accomplish even bending or stooping on any sustained basis. Dr. Overesch's opinion does not, therefore, without more, constitute substantial evidence supporting the Secretary's decision. Substantial evidence means "evidence that 'a reasonable mind might accept as adequate to support a conclusion'." *Miranda v. Secretary of Health, Education and Welfare*, 514 F.2d 996, 998 (1st Cir. 1975).

20. See note 19, *supra*.

F.2d 309, 312 (3d Cir.), cert. denied, 420 U.S. 931, 95 S.Ct. 1133, 43 L.Ed.2d 403 (1973).

■ Finally, the testimony of the vocational expert to the effect that plaintiff, in view of his background, age, and education, could be expected to perform the duties of a movie projectionist, or a worker seated at a bench manipulating small objects, or a bookkeeper or claims clerk [21] does not, under the circumstances of this action, sustain the Secretary's burden of producing evidence on the availability of suitable work in the national economy.[22] For, as noted above, the testimony was based upon the assumption that plaintiff could perform light or sedentary work involving the use of his shoulders, hands, and arms in isolation from the rest of his body. And, as noted above, that is an assumption which is not warranted by the evidence. Not only is it unexplainable in terms of reason and experience how plaintiff could productively accomplish these types of work without repeatedly bending his torso to some extent, but the medical evidence shows overwhelmingly and without contradiction that plaintiff can neither sit nor stand for any appreciable period of time. Further, plaintiff has not had the experience in actual bookkeeping upon which the vocational expert predicates his conclusion that he could perform sedentary clerical duties.[23] At most, the evidence shows that, as a union officer, plaintiff may have inspected the books and accounts for the unit which he supervised.[24] There is no evidence that he has the qualifications of an accountant, or bookkeeper, or a skilled clerical worker. Cf. *Timmerman v. Weinberger*, 510 F.2d 439, 442 (8th Cir. 1975). There is, further, no evidence that these jobs could be sufficiently performed by one whose back condition is compounded by ulcers, pain and anxiety neurosis.[25] And there is not sufficient proof that the jobs mentioned by the vocational expert are available in significant numbers, either in the region where plaintiff lives or in several regions of the country.[26]

**21.** This testimony respecting plaintiff's possible ability to perform sedentary work of a clerical nature appears to be based on an erroneous construction of his testimony to the effect that, as a union officer, he kept no books, but from time to time simply checked the totals which had been entered by the union secretary. See note 9, *supra*. In his testimony in this regard, however, the vocational expert testifies that his basis is plaintiff's "minimal bookkeeping skills." (Tr. 101.) But there is no evidence in the administrative record that plaintiff possessed any level of actual bookkeeping skills.

**22.** The administrative record plainly shows, and the administrative law judge and the Appeals Council found, that plaintiff cannot return to his former work as a millwright and that the inability to return to that work is due to his physical condition. Under these circumstances, "the burden shifts to the Secretary to prove that there is some other kind of substantial gainful employment which the claimant is able to perform. See *Timmerman v. Weinberger*, 510 F.2d 439 (8th Cir. 1975) and cases therein cited. See also *Klug v. Weinberger*, 514 F.2d 423 (8th Cir. 1975)." *Burns v. Weinberger*, 394 F.Supp. 1179, 1187 (W.D.Mo.1975).

**23.** See notes 9 and 21, *supra*.

**24.** See note 9, *supra*.

**25.** It is these complications, which the evidence shows have reduced plaintiff to a condition in which he may only sit stiffly and is never free of nagging pain, which almost certainly disqualify him from the ability to perform any sedentary or clerical work. The fact that he may retain some residual physical function is not, without more, substantial evidence supporting a conclusion that he may successfully undertake sedentary labor. "It is clear that the claimant need not be a total 'basket case' before the courts find that there is an inability to engage in substantial gainful activity." *Timmerman v. Weinberger*, 510 F.2d 439, 442 (8th Cir. 1975).

**26.** " '(W)ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Section 423(d)(2), Title 42, United States Code. It is the burden of the Secretary, if there is no other evidence on this issue, to produce evidence on it. See *Meneses v. Secretary of Health, Education, and Welfare*, 143 U.S.App. D.C. 81, 442 F.2d 803, 807 (1971); cf. *Breaux v. Finch*, 421 F.2d 687, 689 (5th Cir. 1970). Perhaps even more importantly, there is no evidence of plaintiff's capacity to "do specific jobs." *Hernandez v. Weinberger*, 493 F.2d 1120, 1123 (1st Cir. 1974). "The test is whether a particular job is realistically within the physical and mental capabilities of the claimant." *Timmerman v. Weinberger*, 510 F.2d 439, 442 (8th Cir. 1975). The "facts pertaining to the capacity of a specific individual can be

It is not necessary, however, to remand this case to the Secretary for the taking of correct vocational evidence based upon the facts respecting plaintiff's medical condition, background, and the availability of the work in the national economy. For ample opportunity to supply the evidence has once been granted[27] and the evidence of full disability—the inability to perform substantial gainful activity—is more overwhelming with respect to the period after October 22, 1973, than with respect to the period before that date.

It is therefore

ORDERED that defendant's motion for summary judgment be, and it is hereby, denied. It is further

ORDERED AND ADJUDGED that the decision of the Secretary of Health, Education, and Welfare, insofar as it denied disability benefits to plaintiff for the period from October 22, 1973, to August 20, 1975, the date of the Appeals Council decision,[28] be, and it is hereby, reversed and the Secretary is accordingly directed to award disability benefits for that period.[29] Defendant is requested to compute the amount of benefits accordingly due and to report the amount to the court. Plaintiff's counsel should formally move for an allowance of attorney's fees, justifying any amount claimed by him by reference to his expended time and effort in this case.

supplied only by particularized proof." *Taylor v. Weinberger*, 512 F.2d 664, 668 (4th Cir. 1975).

27. See *Bethune v. Finch*, 302 F.Supp. 425 (W.D.Mo.1969).

28. Because, as in this action, the Appeals Council may consider evidence of disability *vel non* through the date of the decision rendered by it, it is proper that the period of disability run to the decision date.

29. Because a period of disability immediately preceded that which is adjudicated in the action at bar, it will not be necessary to invoke another "waiting period" under Section 423(d)(2), Title 42, United States Code, in computing the benefits.